UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIN C. WEBER,

        Plaintiff,

        Case No. 02-74602

vs.

        HON. GEORGE CARAM STEEH

INFINITY BROADCASTING CORP.
et al.,

        Defendants.
_____/

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR JUDGMENT
AS A MATTER OF LAW [116], GRANTING DEFENDANTS' MOTION FOR
REMITTITUR AND DENYING DEFENDANTS' MOTION FOR NEW TRIAL [117],
AND GRANTING PLAINTIFF'S MOTION FOR ATTORNEY FEES AND COSTS
WITH THE AMOUNT OF SUCH FEES AND COSTS TO BE DETERMINED [114]

      Plaintiff, Erin Weber, was hired as the midday host for defendants' WYCD radio station in Detroit in 1999. Plaintiff was successful, and her show highly rated. Frustrated with the station's refusal to move her to the morning slot when it opened, and frustrated because she was paid less than the male hosts of the morning and afternoon shows, she filed a charge of discrimination with the EEOC for violation of Title VII in 2001. Plaintiff's salary at the time of her discharge was $66,000 a year, while male hosts in other time slots were making $100,000 to $200,000.

      Plaintiff had no allergies to perfume before she was hired by WYCD. In 1999, plaintiff had to work a shift in a studio where there had been an accidental spill of chemicals. Plaintiff suffered chemical burns to her airways and sinuses, and testified that she developed a heightened sensitivity to related chemicals. Based on her patient history, plaintiff was initially diagnosed with an allergy to certain chemicals, including

various perfumes. One of plaintiff's co-workers, Linda Bullard, wore a perfume which, according to plaintiff, triggered plaintiff's allergic condition. Plaintiff and her physicians requested that accommodations be made to ensure that plaintiff not be exposed to Ms. Bullard's perfume. In response, the station manager, Ms. Maureen Lesourd, directed Ms. Bullard, on threat of discharge, not to wear the offending perfume, Tresor by Lancome. Ms. Bullard herself testified that she never again wore the perfume to work. Nevertheless, plaintiff testified she was exposed to Ms. Bullard's perfume which resulted in a three month leave after an October 2000 exposure, and a two week leave after a June 2001 exposure. Following a medical leave due to a claimed third exposure in September 2001, plaintiff was terminated for allegedly failing to perform production tasks.

Plaintiff has been unable to find work in the country radio industry, asserting it is due to the fact that defendants own virtually every major-market country music station in the United States. Plaintiff brought her lawsuit, which was tried on counts of gender discrimination in violation of the Michigan Elliott-Larsen Civil Rights Act ("MELCRA"), MCL 37.2101; disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102; disability discrimination in violation of the Michigan Persons with Disabilities Civil Rights Act ("MPDCRA"), MCL 37.1101; retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); retaliation in violation of the Elliott-Larsen Civil Rights Act, MCL 37.2701(a); violation of the Equal Pay Act ("EPA"), 29 U.S.C. §206(d)(1); and retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615.

The jury found in favor of plaintiff on her claims of disability discrimination, violation of the EPA, and retaliation. The jury awarded plaintiff $514,000 for past economic damages; $1,078,000 for future economic damages; $2,000,000 for past and future non-economic damages; and $7,000,000 for punitive damages under the federal retaliation and federal disability discrimination claims.

Defendants brought post-trial motions for judgment as a matter of law and new trial and/or remittitur. For the reasons stated below, the court grants in part defendants' motion for judgment as a matter of law, grants defendants' motion for remittitur and denies defendants' motion for new trial, and grants plaintiff's motion for attorney fees and costs, with the amounts of such fees and costs to be determined at a later date.

I. <u>Judgment as a Matter of Law</u>

As plaintiff points out, defendants moved for a directed verdict on certain issues after the close of plaintiff's proofs, but did not timely renew their motion after the close of all proofs. This failure on the part of defendants was not due to a lack of effort on their part, but rather due to a direction from the court. The court took defendants' first motion under advisement, and when defendants indicated an intention to renew their motion, the court instructed them to wait until the jury had been given the case. Under these circumstances, defendants will not be penalized for a technical deviation from Rule 50(b)'s procedure. See <u>United States v. Medshares Management Group, Inc.</u>, 400 F.3d 428, 447-49 (6th Cir. 2005).

Defendants are, however, constrained by the issues raised in their oral Rule 50 motions. In this case, defendants argued on the record only that there was inadequate evidence on plaintiff's gender discrimination claim and Equal Pay Act claim, and that

3

plaintiff failed to support her disability claim based on failure to accommodate in that her request for accommodation was not in writing and the midnight position was not vacant and available.

The court believes that there is some merit to several of defendants' current arguments for judgment as a matter of law. However, many of these arguments have been waived by defendants' failure to raise them in a motion after the presentation of all of the proofs. Gutzwiller v. Fenik, 860 F.2d 1317, 1330 (6th Cir. 1988). The court has reviewed the evidence in a light most favorable to plaintiff, and, in particular, recognizes serious problems for plaintiff in supporting her claim that she has a perfume allergy. While plaintiff was initially diagnosed with a perfume allergy, plaintiff's ENT specialists, Dr. Schwartzenfeld and Dr. Mohr, were unable to say with reasonable medical certainty that her symptoms were caused by an allergy, and testified at trial that they believed her problems were likely the result of a form of acid reflux disease. The specialists recommended further testing to refine their diagnosis, however plaintiff did not follow this recommendation and did not pursue testing or treatment for acid reflux. The only evidence that supports a conclusion that plaintiff suffered from a perfume allergy is plaintiff's own testimony, and of course her counsel's argument. The weight of the evidence does not clearly support a finding of a perfume allergy.

Moreover, there are several reasons that plaintiff's perceived allergy does not constitute a disability. In addition to plaintiff's impairment being too intermittent to constitute a disability, it appears to the court that an impairment of her "radio voice" likely does not qualify as a "major life activity," whereas the ability to speak in a standard environment would so qualify. See, Ross v. GTE Directories Corp., 73 F.Supp.2d 1342

(M.D. Fla. 1999); Crawley v. Runyon, 1998 WL 355529 (E.D. Pa. June 30, 1998). Furthermore, for working to be considered a major life activity, the plaintiff must be unable to work in a broad class of jobs. Sutton v. United Airlines, Inc., 527 U.S. 471 (1999). However, the fact that this court might believe defendants have a valid argument that plaintiff lacks sufficient evidence to prove she had a perfume allergy, or that such allergy qualifies as a disability under state or federal law, is of little consequence where defendants have waived such arguments by failing to raise them at the appropriate time. The court will therefore address only those arguments properly preserved by defendants.

    A. Accommodation

        1. Request to Accommodate Must be in Writing

The PWDCRA requires employees to request accommodations in writing, MCL 37.1210(18), but the statute also requires employers to give notice of this requirement. MCL 37.1210(19). The statute expressly conditions an employer's ability to invoke subsection 18 on its own compliance with subsection 19. MCL 37.1606(5). There is no indication that defendants complied with subsection 19 in this case.

Moreover, plaintiff did request accommodations in writing, and defendants' own evidence indicated that they construed the note from plaintiff's doctor as a written request for accommodation. Plaintiff's Exhibit 93 is a physician letter stating that plaintiff should not be exposed to Ms. Bullard's perfume. Plaintiff's Exhibit 92 is a letter from plaintiff to Ms. Maureen Lesourd stating that "the Doctor also specifies that for me to return to work, [Ms. Bullard] needs to be kept away". Plaintiff's Exhibit 103 is an e-mail from plaintiff to Lesourd and Lisa Rodman stating that "[m]y doctor has told me -

and informed you both in writing - that reexposure [sic] risks me loosing [sic] my voice again for even longer than the last time - and perhaps for a lifetime." Finally, a memorandum from Lesourd to plaintiff notes that defendants "have been accommodating your request for limiting your work duties as your doctor's note of February 21, 2001 requests." There is ample evidence that plaintiff's request for accommodation was in writing for the issue to have gone to the jury.

      2. <u>Duty to Accommodate</u>

Defendants argue that there was no duty to accommodate plaintiff by moving her to the midnight shift because there was no vacant position. Ron Brand had been the host of the midnight shift. Ron Chatman testified that when Brand was removed, Chatman took over the shift, and remains there today. Plaintiff argues that they offered her the midnight shift, so it must have been vacant. Also, because the nature of radio is that there cannot be dead air, it was defendants' practice to fill vacancies with temporary hosts while searching for a full-time replacement. Accepting plaintiff's testimony on this issue, there was a factual issue created with respect to the existence of a vacancy on the midnight shift and the jury was permitted to resolve it in plaintiff's favor.

      B. <u>Equal Pay Act</u>

The EPA provides that an employer shall not pay wages to employees of one gender less than it pays to employees of the opposite gender for work on jobs "the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 42 U.S.C. § 206(d)(1). It is not a statutory violation to pay different wage rates if the differential is "based on any factor other than

sex." Id. The essence of an EPA claim is that two jobs are equal, but that different wages are paid to men and to women. The focus of any EPA analysis must be on the nature of the jobs themselves, not the ability or performance of the individuals holding the jobs.

In this case, plaintiff was host of the midday show, and she is comparing herself to men who hosted the morning and afternoon positions. When comparing the specifics of the jobs, one might conclude that they should be paid the same because both jobs require the same skills. Perhaps the midday host should even be paid more for doing a one-person show. However, there was significant testimony regarding the difference between the shows themselves. The morning show is an ensemble show, which was faster paced, with more entertainment and less music. Ron Chatman testified that the morning show plays far fewer songs per hour than midday, and that midday is more music and less entertainment driven. The midday show is so music oriented that the host actually speaks on-air for less than 10 minutes in a given hour, and the show averages 13 songs per hour. The morning show averages 8 songs per hour.

There was substantial evidence that it is industry practice for hosts of morning and afternoon shows to be paid more than hosts of midday shows. There was uncontroverted testimony from Maureen Lesourd and Lisa Rodman that a female, Karen Delassandro, was offered the position as host of the morning show, with a six-figure salary.

When you compare plaintiff's salary to the people in her exact position, she was the highest paid midday host. She was paid more than the female who preceded her, and more than the male who succeeded her. In addition, plaintiff was paid more than

Brian Hatfield, host of the evening show, and Ron Brand, host of the midnight show. Hosts of shows with different formats - which aired at different times of the day and which were of different lengths - and who were coming from a variety of backgrounds, experiences and bargaining positions, were each paid a different wage. Plaintiff admitted that she asked to be paid $75,000 when hired, was actually paid $64,000 when she was hired, and is comparing herself to men who were paid $200,000. Even if defendants had paid plaintiff exactly what she requested, they still would have been in violation of the EPA according to plaintiff's claim.

There are many permissible factors, other than gender, which justify a wage differential and do not violate the EPA. See, e.g., Horner v. Mary Institute, 613 F.2d 706, 714 (8th Cir. 1980) (paying a higher salary to a male employee because his "experience and ability made him the best person available for the job and because a higher salary was necessary to hire him," was a permissible factor other than gender); Walter v. KFGO Radio, 518 F.Supp. 1309, 1318 (D.N.D. 1981) (education, experience, and marketplace value of an individual's skills are permissible factors other than gender); Wachter-Young v. Ohio Cas. Group, 236 F.Supp. 2d 1157 (D. Or. 2002) (consideration of prior salaries is an acceptable business purpose which constitutes a factor "other than sex" for EPA purposes).

In this case there was compelling evidence that factors other than gender justified a wage differential, including Chuck Edwards coming from Dallas to Detroit and his 10 consecutive years of hosting the #1 rated afternoon show in the #1 country market in the nation; and Kevin O'Neill's significant prior experience in Detroit and his having previously teamed with one of the employees who was already part of the

WYCD morning drive show. The fact that prior salaries were higher is also a permissible consideration. Engelmann v. National Broadcasting Co., 1996 U.S. Dist. LEXIS 1865 (S.D.N.Y. 1996). The testimony at trial was that each host's salary was negotiated and determined individually, which is another permissible factor other than gender. E.E.O.C. v. Louisiana Network, 809 F.Supp. 1210, 1228 (M.D. La. 1992). Chuck Edwards' testimony was that he was able to renegotiate his contract after receiving an offer from a station in Arizona. Negotiation is a permissible factor other than gender to consider in determining wages. Id.

There was insufficient evidence to submit to the jury as to whether there was an EPA violation, and there was insufficient evidence for the jury to conclude that the shows were equal, or that any pay differentials were because of gender. There could be no violation of the EPA, and defendants are entitled to judgment as a matter of law.

II. Remittitur

A. Legal Standard

Under Michigan law, in determining whether remittitur is proper, the courts inquire as to: (1) whether the verdict "shocks the judicial conscience"; (2) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; (3) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and (4) whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions." Palenkas v. Beaumont Hospital, 432 Mich. 527; 443 N.W.2d 354 (1989). As an alternative to granting a new trial, the court may grant a remittitur when "the award clearly exceeds the amount which, under the evidence in the

case, was the maximum that a jury could reasonably find to be compensatory" for the plaintiff's loss. Bickel v. Korean Air Lines, Co., Ltd., 96 F.3d 151, 156 (6th Cir. 1996).

    B.  Analysis

        1.  Non-Economic Damages

The jury awarded $2,000,000 for non-economic damages for mental anguish and emotional damages. The Sixth Circuit has held:

> Damages for mental and emotional distress will not be presumed, and must be proven by "competent evidence." However, emotional injury may be proved without medical support. A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard.

Moorer v. Baptist Memorial Health Care System, 398 F.3d 469, 486 (6th Cir. 2005). A jury "award must stand unless it is (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake." Gregory v. Shelby County, 220 F.3d 433, 443 (6th Cir. 2000). A verdict may be deemed excessive only when the "amount awarded is greater than 'the highest amount the evidence will support.'" Palenkas, 432 Mich. App. at 531 (1989).

Plaintiff's non-economic damages case was based on her testimony that she suffered emotional trauma and mental anguish as a result of being effectively barred from the career that had been her passion for 25 years. Plaintiff testified that her job was a major part of her identity and pride. Losing her job and the ability to be employed elsewhere in the industry radically altered her financial situation, placing stress on her family life, and causing her to worry about losing her home.

The only evidence introduced at trial regarding the mental anguish and emotional distress suffered by plaintiff consisted of plaintiff's own testimony. Plaintiff's testimony

10

was not corroborated by anybody who would have been in a position to confirm how the loss of her job and the way she was treated by defendants affected plaintiff.  Plaintiff conceded at her deposition, at trial, and in her answers to interrogatories, that she did not seek or require any treatment for mental or emotional distress resulting from defendants' actions, nor did she take any medication for any such distress.

Plaintiff relies on the case of Olsen v. Toyota Technical Center, No. 229543, 2002 WL 31958183 (Mich. Ct. App. Dec. 27, 2002), wherein the court upheld an award of mental distress damages of $5 million.  The plaintiff in Olsen was terminated after he began missing work due to a disability suffered on the job.  Olsen re-injured his back as a result of his employer's refusal to comply with work restrictions and repeated requests for assistance.  Olsen needed surgery, was in constant pain, and was basically incapacitated by his injuries.  The testimony was that Olsen was unable to sleep, was unable to engage in leisure activities which he had previously enjoyed, and was unable to engage in intimate marital relations.  His typical day "consisted of efforts to find some comfort, usually sitting in a special reclining chair designed for people with back injuries or lying in bed." Id. at 4-5.

In Olsen, the plaintiff experienced disabling physical injuries as a result of his employer repeatedly ignoring work restrictions.  In affirming the damage award, the Michigan Court of Appeals referred to "the jury's five million dollar award for pain and suffering damages." Id. at 9.  The court did not refer to the non-economic damages as being for non-physical mental anguish damages, as plaintiff is arguing here.

In contrast to the facts of Olsen, plaintiff testified that she is able and willing to work.  Plaintiff has not undergone surgery for her disability, nor was she in constant,

unrelenting pain comparable to that suffered by the plaintiff in Olsen. Plaintiff is able to engage in physical activities - even during episodes of voice strain and throat pain - including going to movies, out to dinner, shopping with friends, and taking a ski weekend with her husband.

Olsen does not provide support for the non-economic damages awarded in this case. There is a lack of supporting testimony or corroboration in this case, even from plaintiff's husband. Plaintiff testified that she has never consulted or treated with any psychiatrist, psychologist or mental health care professional, and that she never felt the need to do so. She admitted that none of her treating physicians ever recommended that she consult with a mental health care provider. Plaintiff has never been prescribed any medications for stress, nerves or depression. Plaintiff admitted that for lengthy periods of time, up to several years at a time, she never even treated with an ENT for the allergy condition that she insists is life threatening. In addition to not pursuing treatment of her perfume allergy, plaintiff did not pursue the diagnosis of reflux. Not even plaintiff's own testimony claims damages of the extent that would support a $2 million verdict.

The evidence and circumstances of this case do not support an award of mental distress damages in the amount of $2,000,000. The Court will remit in accordance with the cap provided in 42 U.S.C. § 1981a(b)(3), as described below.

### 2. Punitive Damages

By statute, a jury may award punitive damages in a discrimination case "if the complaining party demonstrates that the respondent engaged in a discriminatory practice . . . with malice or with reckless indifference to [her] federally protected rights."

42 U.S.C. § 1981a(b)(1). "The terms 'malice' and 'reckless indifference' pertain not to the employer's awareness that it is engaging in discrimination, but to its knowledge that it may be acting in violation of federal law." Kolstad v. American Dental Assoc., 527 U.S. 526, 527 (1999). "This standard requires a plaintiff to prove more than merely intentional discrimination." White v. Burlington Northern & Santa Fe Railway Co., 364 F.3d 789, 808 (6th Cir. 2004). In the Sixth Circuit, "[t]he imposition of punitive damages in civil rights actions has generally been limited to cases involving egregious conduct or a showing of willfulness and malice on the part of the defendant." Beauford v. Sisters of Mercy-Province of Detroit, 816 F.2d 1104, 1109 (6th Cir. 1987).

Plaintiff argues that there is sufficient evidence of malice where defendants retaliated against her for filing a complaint with the EEOC. Indeed, defendants fired plaintiff just days after the EEOC dismissed plaintiff's charge of discrimination because the evidence did not establish a violation of the statute. Because the defendants were essentially vindicated by the EEOC's closing of plaintiff's case without finding any violations of federal law, this is not strong evidence that defendants discriminated in the face of a perceived risk that their actions violated federal law. Still, the jury could have inferred malice from the timing of plaintiff's termination, and defendants have not challenged the jury's retaliation verdict. See, EEOC v. Harbert-Yeargin, Inc., 266 F.3d 498, 514 (6th Cir. 2001).

It is fair to say that the defendants were tired of dealing with plaintiff's demands for accommodation and her absences from work. Maureen Lesourd testified she believed plaintiff was lying about her claims of reexposure to Linda Bullard's perfume. It is not impossible, however, for a reasonable fact finder to conclude that defendants

13

were motivated in part by retaliation for plaintiff filing an EEOC charge. However, even this evidence of animus is not strong enough to support the excessive punitive verdict awarded by the jury. Accordingly, the Court will remit the punitive damage award.

### 3. Statutory Cap on Compensatory and Punitive Damages

Plaintiff contends that the statutory cap set forth in 42 U.S.C. § 1981a(b)(3) is an affirmative defense which has been waived because it was not affirmatively pled. Defendant cites the court to cases from other jurisdictions which have held that the precise statutory cap at issue here is not an affirmative defense. See, Oliver v. Cole Gift Centers, Inc., 85 F.Supp.2d 109, 112 (D. Conn. 2000); Peckinpaugh v. Post-Newsweek Stations, 1999 U.S. Dist. LEXIS 21289 (D. Conn. 1999); Paris v. Dallas Airmotive, 2001 U.S. Dist. LEXIS 10772 (N.D. Tx. 2001). The Oliver court rejected the argument made by plaintiff:

> No plaintiff claiming damages under Title VII can complain of unfair surprise, prejudice, or lack of opportunity to respond when confronted with the CDA's [Compensatory Damages Amendment] limitation of damages, because the limitation is part of the same statutory scheme under which the plaintiff has brought his or her claim.

Oliver, 85 F.Supp.2d at 112. While the Court finds the reasoning of Oliver persuasive in holding that the statutory cap in § 1981a is not an affirmative defense which is waived if not affirmatively pled, it is unnecessary to reach that conclusion in this case because the damages awarded so clearly exceed the amount supported by the evidence. The cap serves as a benchmark of appropriate damages for the Court in this case where plaintiff did not adequately mitigate her damages. Plaintiff admittedly failed to pursue testing to rule out acid reflux. She testified that she applied only to country music stations, and did not pursue any other type of work, including other formats in the radio

industry. The court must also consider that defendants had legitimate, as well as illegitimate, reasons to act as it did. The Court views the cap, which is the legislature's opinion as to an appropriate upper figure for damages in a federal discrimination case, as a fair guideline for limiting damages awarded in this case for violations of both federal and state law.

Plaintiff argues that even if compensatory and punitive damages are capped at $300,000, she is entitled to $300,000 under the Title VII retaliation claim and an additional $300,000 under her ADA claim. The Sixth Circuit has conclusively decided this issue contrary to plaintiff's argument:

> Under the plain language of the statute, the cap on . . . damages applies to each complaining party in an "action". An "action" is simply a "lawsuit brought in court" . . . . Put simply, the § 1981a caps apply to each party in an action, not to each claim, and there is nothing in the language of the statute to indicate otherwise.

Hudson v. Reno, 130 F.3d 1198, 1200 (6th Cir. 1997).

The limitation in § 1981a(b)(3) applies to "[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section". The limitation does not apply to backpay. § 1981a(b)(2). The Court is guided by § 1981a(b)(3) in this case and remits the sum of future economic damages[1], non-

---

[1] The Court seriously considered remitting future economic damages to zero, given that plaintiff was admittedly not under an employment contract and was an employee at will. Testimony from Maureen Lesourd also established that company practice provided no job security based on performance. The top paid, top performing artist, Chuck Edwards, himself had been let go when the company was unwilling to meet his pay demands at the time of contract renewal.

15

economic damages and punitive damages awarded to a total of $300,000. Defendants did not move to remit the jury's past economic damage award of $514,000, which the Court hereby affirms.

III. New Trial

Defendants alternatively move for a new trial for the reasons that the jury's verdict was inherently inconsistent and against the weight of evidence and erroneous, because of various procedural irregularities during deliberations, and because the award was excessive and beyond the range supported by the evidence.

A. Legal Standard

The Sixth Circuit has interpreted Fed.R.Civ.P. 59(a) as allowing for a new trial "when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." Meyers v. Wal-Mark Stores, East, Inc., 77 F.Supp.2d 826, 828 (E.D. Mich. 1999), *aff'd*, 257 F.3d 625 (6th Cir. 2001).

> A motion under Rule 59 is an appropriate means to challenge the size of the verdict. The Court always may grant relief if the verdict is excessive or inadequate as a matter of law, but this is not to limit the Court's power. It may also grant a new trial if the size of the verdict is against the weight of the evidence.

Edwards v. Flagstar Bank, 109 F.Supp.2d 691, 695 (E.D. Mich. 2000), *aff'd in part, rev'd in part on other grounds*, 295 F.3d 565 (6th Cir. 2002). Whether to grant or deny a motion for new trial is "committed to the sound discretion of the trial court." Id.

B. <u>Analysis</u>

1. <u>Jury's Verdict Inherently Inconsistent</u>

Defendants argue an inconsistency in the jury's verdict concerning the issue of gender discrimination. In response to Question 1 of the Special Verdict Form, the jury concluded that defendants did not discriminate against plaintiff on the basis of her gender. Defendants allege this is inconsistent with the response to Question 2, finding that defendants did discriminate against plaintiff in violation of the Equal Pay Act. "When faced with a claim that a verdict is inconsistent," courts must "look for a reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case." <u>Morales v. American Honda Motor Co.</u>, 151 F.3d 500, 509 (6th Cir. 1998). This issue has become moot because the Court granted judgment as a matter of law on plaintiff's EPA claim.

2. <u>Procedural Irregularities During Deliberations</u>

Defendants object to the dismissal of Juror #4 for an alleged "medical emergency" after seven days of contentious deliberations and at least two notes from the jury expressing that it was deadlocked. Fed. R. Civ. P. 47 permits the court to dismiss a juror for "good cause." Defendants argue that the dismissal of Juror #4 had the *de facto* effect of eliminating a lone hold-out, and that the juror was dismissed prior to defendants placing an objection on the record. In addition, the juror was dismissed without any consultation with counsel, as was past practice in this case. Defendants seeks an order granting a new trial for these reasons.

A court's decision to dismiss a juror "will not be grounds for reversal unless an abuse of discretion has been committed." <u>United States v. Brown</u>, 571 F.2d 980, 985

(6th Cir. 1978). The record should be clear that Juror #4 was dismissed because of a medical problem, not because she was a hold-out. Courts routinely uphold the dismissal of jurors for medical reasons. Defendants' motion to grant a new trial for procedural irregularities during deliberations is denied.

       3. Excessive verdict

There are many reasons to seriously consider setting aside the verdict in this case, and after careful consideration, this Court came close to doing just that. The size of the verdict, especially for punitive damages, is telling evidence that the jury in this case was inflamed. It is unclear whether the jury's prejudice was a result of the passion with which plaintiff's counsel tried the case, the peculiar composition of the all female jury, the defendants' failure to pursue arguments which would have obliterated many of plaintiff's claims, or defendants' failure to focus sufficient attention to the damages issues in the case. However, there is sufficient evidence to support the jury's finding of retaliation, and any unfairness arising from the jury's emotion can be cured through remittitur. The Court, therefore, denies defendants' alternative motion for new trial.

IV. Plaintiff's Motion for Attorney Fees and Costs

Plaintiff's counsel seeks an award of attorney fees as the prevailing party in the amount of $411,987.50, through May 31, 2005. In addition, plaintiff's counsel seeks a 50% enhancement due to the quality of legal services provided, the results achieved, and the contingent nature of the work. Finally, plaintiff's counsel seeks $11,303.73 to be reimbursed as costs expended in the case.

Defendants oppose plaintiff's counsel's motion, and the Court finds many of defendants' challenges to be without merit. For example, defendants' argument that

plaintiff's counsel's fees should be reduced because plaintiff failed to prevail on all of her claims is not meritorious. Likewise, plaintiff's counsel's claim for an enhancement of his attorney fees is not compelling.

Defendants attack the reasonableness of many of plaintiff's counsel's submissions of hourly records. The Court will need to hold a hearing to determine the reasonableness of hours expended. The same goes for defendants' objections to the recovery of certain costs. At this time, the Court grants plaintiff's motion for attorney fees and costs, with the exact amount to be determined at a later date.

V. <u>Conclusion</u>

Defendants' motion for judgment as a matter of law is granted as to plaintiff's Equal Pay Act claim. Defendants' motion for remittitur is granted as to compensatory and punitive damages, which are remitted to $300,000. Plaintiff is entitled to recover $514,000 for past economic damages and $300,000 for compensatory and punitive damages, for a total of $814,000. Defendants' motion for new trial is denied. Plaintiff's motion for attorney fees and costs is granted, with the exact amount of recovery to be determined by the Court at a later date.

                                                s/George Caram Steeh
                                                GEORGE CARAM STEEH
                                                UNITED STATES DISTRICT JUDGE

Dated: December 14, 2005

                        CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on December 14, 2005, by electronic and/or ordinary mail.

                                                s/Josephine Chaffee
                                                Secretary/Deputy Clerk